**United States District Court**
**District of Massachusetts**

```
_____
                               )
EdgePoint Capital Holdings, LLC, )
                               )
          Plaintiff,           )
                               )
              v.               )      Civil Action No.
                               )      19-10522-NMG
Apothecare Pharmacy, LLC,      )
                               )
          Defendant.           )
_____)
```

**MEMORANDUM & ORDER**

**GORTON, J.**

This case arises out of a contract dispute between plaintiff EdgePoint Capital Holdings, LLC ("EPCH" or "plaintiff") and defendant Apothecare Pharmacy, LLC ("Apothecare" or "defendant").  Pending before the Court are the cross motions of the parties for summary judgment on plaintiff's claims and the motion of EPCH for summary judgment on Apothecare's defense of fraudulent inducement.

## I.  Background

### A.  The Parties

EPCH is a financial services firm located in Beachwood, Ohio that performs investment banking advisory services.  EPCH is affiliated with EdgePoint Capital Advisors, LLC ("EdgePoint

Advisors", collectively with EPCH, "EdgePoint") which also performs investment banking advisory services but, unlike EPCH, is a registered broker dealer in Massachusetts.  EPCH and EdgePoint Advisors are separate legal entities but they are owned by the same person, operate out of the same office and employ many of the same individuals.

Defendant Apothecare is a long-term care pharmacy located in Brockton, Massachusetts.  It specializes in providing medications to group home patients, hospice patients, assisted living patients and certain community-based entities that require specialized pharmaceutical packaging.  Rudy Dajie ("Dajie") acquired Apothecare in 2012 and served as its Chief Executive Officer until November, 2019.

### B.  Negotiation

Dajie, who was contemplating a sale of his company, was introduced to EdgePoint by his financial advisor, in December, 2015.  At that time, Daniel Weinmann ("Weinmann"), managing director at EPCH, provided an initial "pitch" to Dajie regarding EdgePoint's services which included the brokering of the sales of businesses.  He noted that "EdgePoint" was a registered broker dealer.  The next day, Weinmann emailed to Dajie a draft engagement agreement which identified EdgePoint Advisors as a

contracting entity.  Following some discussion, Weinmann sent Dajie a revised agreement on behalf of EdgePoint Advisors.

In June, 2016, Dajie enlisted the assistance of his financial advisor to further negotiate with EdgePoint.  Shortly thereafter, Weinmann sent Dajie an updated draft containing several changes, including most notably a change in the contracting entity from EdgePoint Advisors to EPCH.

### C.  The Agreement

Represented by counsel, Dajie executed the final agreement with EPCH on September 5, 2016, ("the Sell-Side Agreement" or "the Agreement").  The Sell-Side Agreement provides that EPCH would assist Apothecare

> in the sale of all or part of [Apothecare] or its assets . . . or assist[] in the formation of a joint venture.

The Agreement further provides that Apothecare shall pay EPCH a "Success Fee" "[i]n the amount of a percentage . . . of the transaction value . . . or $350,0000, whichever is greater." Under the terms of the Agreement, Apothecare is

> obligated to pay EdgePoint a [Success Fee] in the event of the sale of the company(ies), joint venture creation or similar transaction during the term of this Agreement or within 18 months of the date of the termination of this contract for: (i) any Transaction with a company or individual identified or contacted by Seller or EdgePoint during the term of this agreement (a "Transactional Partner")) [that] is consummated by Seller . . . .

- 3 -

("the Fee Tail Provision").  Dajie asked Weinmann to strike the
Fee Tail Provision but Weinmann refused.

> Apothecare further agreed to
>
> indemnify and hold EdgePoint, its principals, officers
> and employees harmless against all claims, losses
> damages, liabilities, judgments, costs and expenses
> (including attorneys fees) arising out of or related
> to EdgePoint's engagement . . . .

("the Indemnification Provision").

### D.  **Performance of the Agreement**

In October, 2016, Weinmann and his EdgePoint colleague,
Matthew Lazowski ("Lazowski"), compiled a "Potential Buyers
List" of approximately 400 companies that had expressed interest
in transactional opportunities in the healthcare services
industry.  Among the companies listed were Clearview Capital LLC
("Clearview") and Starboard Capital Partners, LLC ("Starboard").

EPCH contends that, prior to sending the Potential Buyers
List to Apothecare, Lazowski spoke with an acquaintance at
Clearview named Matthew Blevins ("Blevins").  Lazowski asked
Blevins if Clearview might be interested in purchasing a company
with characteristics similar to Apothecare but did not mention
Apothecare by name.  Apothecare responds that Lazowski's
explanation of this alleged encounter is ambiguous and
unsupported.

While preparing the Potential Buyers List, Weinmann and Lazowski simultaneously drafted a confidential information memorandum ("CIM") to distribute to potential buyers. Completion of the CIM required Apothecare to supply certain financial information.

In October, 2016, EPCH transmitted a draft CIM to Dajie that questioned the accuracy of Apothecare's financial statements.  Specifically, Apothecare's accounts receivable and revenue from durable medical equipment were purportedly understated.

In November, 2016, Weinmann sent Dajie a revised CIM ("the Client Approved CIM") featuring the same inaccurate financial information but with a note indicating that EPCH was working with Apothecare's CPA to correct the discrepancy.

Weinmann informed Dajie that distributing the Client Approved CIM with the stated inaccuracies would be a "deal killer".  Dajie agreed and insisted on withholding the Client Approved CIM until the financial inaccuracies were remedied.

Apothecare was unable to correct the accounting problem and, consequently EPCH was never authorized to transmit the Client Approved CIM to any potential buyers.

### E.  EdgePoint's Assignment Procedure

Upon engaging a client, it is EdgePoint's practice to assign the contract to either EPCH or EdgePoint Advisors depending on the likelihood that the engagement will entail a securities transaction.  If the contract is likely to involve securities, it will be assigned to EdgePoint Advisors, a registered broker dealer, otherwise it will be assigned to EPCH. This procedure was never explained to Dajie or anyone else at Apothecare.

### F.  Termination of the Agreement

Apothecare sent EPCH a notice of its intent to terminate the Sell-Side Agreement on August 21, 2017, ("the Termination Letter").  The Termination Letter, drafted by Apothecare's attorney Samuel Lauricia ("Attorney Lauricia"), provides "notice of termination of the Agreement" and states with respect to the Fee Tail Provision that

> Transactional Partner [a term used in the Agreement] is defined as a company or individual identified or contacted by [Apothecare] or EdgePoint during the term of th[e] Agreement.  As no "Transactional Partner" was identified or contacted by [Apothecare] or EdgePoint prior to the date of [the Termination Letter], the 18-month survival period is, for all intents and purposes, moot and without effect. . . . Notwithstanding the preceding, and in any event, at this time, Mr. Dajie is not interested in selling Apothecare as originally contemplated back when the Agreement was entered into in September of 2016.  If in the future Mr. Dajie reconsiders the desire to sell

- 6 -

> Apothecare, he may, but is not obligated to, re-engage
> EdgePoint if it so desires to be re-engaged.

EPCH did not respond to or contest the substance of the
Termination Letter, other than to the extent it does so in this
lawsuit.

### G.  Apothecare/Clearview/Starboard Transaction

On October 3, 2017, Dajie authorized Attorney Lauricia to
solicit potential buyers for Apothecare.  Shortly thereafter,
Dajie's financial advisor emailed Dajie a copy of EPCH's
Potential Buyers List and Client Approved CIM for "review and
discussion".

On November 30, 2017, Peter Smith ("Smith"), a Managing
Director of Starboard, had lunch with Christopher Graham
("Graham"), Dajie's estate planning attorney to discuss an
investment opportunity unrelated to Apothecare.  During that
lunch, Smith informed Graham that Starboard was interested in
investing in companies in the healthcare and pharmacy
industries.  Graham mentioned Apothecare to Smith, who testified
that was the first time he had heard of Apothecare.

The next day, on December 1, 2017, Smith received a non-
disclosure agreement ("NDA") regarding Apothecare from Graham.
Smith executed the NDA and emailed it to Attorney Lauricia.
Smith spoke with Dajie for the first time on December 6, 2017.

Thereafter, Smith contacted William Case ("Case") from Clearview about Apothecare.  Case testified that was the first time he had been informed about Apothecare.  Case further testified that he was unaware of anyone at EdgePoint contacting anyone at Clearview regarding Apothecare.

On December 22, 2017, Starboard and Apothecare executed a non-binding Letter of Intent regarding an equity acquisition of Apothecare.  In January, 2018, Starboard and Clearview executed a co-sponsorship agreement regarding the acquisition.

In July, 2018, Apothecare closed on a recapitalization transaction that resulted in an equity sale to Clearview and Starboard ("the Transaction").  Dajie acquired a 30% equity interest in Apothecare Pharmacy Holdings, LLC, an entity formed during the Transaction and received approximately $30 million in cash.  Clearview acquired a 64.5% interest and Starboard acquired a 5.5% interest in what was originally Apothecare.

Dajie continued as CEO of Apothecare until November, 2019, when he was involuntarily terminated for cause.  Apothecare's current Board of Directors consists exclusively of individuals associated with Clearview and Starboard.

### H.  Procedural History

EPCH filed this lawsuit against Apothecare in September, 2018, alleging breach of contract (Count I) and contractual indemnification (Count II).  Apothecare raises six affirmative defenses, including" (1) failure to perform, (2) failure to state a claim, (3) unconscionability, (4) violation of public policy, (5) illegality and (6) waiver.  EdgePoint moved for summary judgment in April, 2020.  Apothecare timely opposed and cross-moved for summary judgment.  In May, 2020, the Court granted Apothecare leave to amend its answer to include the additional defense of fraudulent inducement, with respect to which EdgePoint separately moved for summary judgment in June, 2020.

## II.  Cross Motions for Summary Judgment

### A.  Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)).  The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is material if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

If the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The Court must view the entire record in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).  Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Celotex Corp., 477 U.S. at 322-23.

### B.  Arguments of the Parties

EPCH seeks to recover its Success Fee under the Fee Tail Provision of the Sell-Side Agreement on the grounds that Dajie

sold a controlling interest in Apothecare to two investors
initially identified and/or contacted by EPCH less than 18
months after the termination of the Agreement.  EPCH further
seeks enforcement of the Indemnification Provision, by ordering
Apothecare to pay its legal fees incurred in filing this
lawsuit.

Defendant responds that (1) the Agreement was illegal
because EPCH was not a registered broker-dealer and (2) EPCH is
not entitled to collect the Success Fee because it did not
"identify or contact" either investor.  Apothecare further
opposes EPCH's request for indemnification.

## C. Analysis

### 1. Illegality of the Agreement

The Securities and Exchange Act of 1934 ("the Exchange
Act") provides that

> It shall be unlawful for any broker or dealer . . . to
> effect any transactions in, or to induce or attempt to
> induce the purchase or sale of, any security [with
> certain limited exceptions] unless such broker or
> dealer is registered in accordance with [the Exchange
> Act].

15 U.S.C. § 78o(a)(1).  A "broker" is defined as one who
"engage[s] in the business of effecting transactions in
securities for the account of others." § 78c(a)(4)(A).

The corresponding provision in the Massachusetts Uniform Securities Act ("the MUSA") provides that

> It is unlawful for any person to transact business in [Massachusetts] as a broker-dealer or agent unless he is registered under [the MUSA].

Mass. Gen. L. c. 110A, § 201.  A "broker-dealer" is anyone who "engage[s] in the business of effecting transactions in securities for the account of others or for his own account." § 401(c).  Both the Exchange Act and the MUSA void contracts with unregistered broker-dealers. 15 U.S.C. § 78cc(b); Mass. Gen. L. c. 110A, § 410(f).

The parties initially dispute whether the Court should confine its analysis to the four corners of the Sell-Side Agreement or look to the underlying Transaction.  Apothecare contends that, because the Transaction involved securities, EPCH's failure to register as a broker-dealer voids the Sell-Side Agreement.  EPCH rejoins that it was not involved in the Transaction, the Sell-Side Agreement could have been performed without violating the securities laws and, in any event, EdgePoint qualifies for the safe harbor provision of the MUSA.

Pursuant to both federal and state law, a contract may be voided if it was either made or performed in violation of the securities laws. See Reg'l Props., Inc. v. Fin. and Real Estate Consulting Co., 678 F.2d 552, 560 (5th Cir. 1982)("Section 29(b)

does not render void only those contracts that 'by their terms' violate the Act."); NTV Mgmt., Inc. v. Lightship Glob. Ventures, LLC., 140 N.E.3d 436, 446 (Mass. 2020) (similar).  In applying that standard, courts look to both the text of the contract as well as the resulting transaction to determine whether either involved the purchase or sale of securities by an unregistered entity. See Reg'l Props., Inc., 678 F.2d at 560; NTV Mgmt., Inc., 140 N.E.3d at 446.

The Court readily concludes that the Transaction involved the purchase and sale of securities.  The Letter of Intent refers to the purchase of "stock" in Apothecare and the economic realities of the Transaction are investment based. See Landreth Timber Co. v. Landreth, 471 U.S. 681, 686 (1985) ("Most instruments bearing such a traditional title [like 'stock'] are likely to be covered by the definition [of securities]."); United Hous. Found., Inc. v. Forman, 421 U.S. 837, 850-52 (1975) (explaining there is "no distinction" between an investment contract and a security).  It is further undisputed that EdgePoint is not a registered broker dealer.  In a typical case, the involvement of securities and failure to register as a broker would be sufficient to void a contract, even if already performed. See Reg'l Props., Inc., 678 F.2d at 560.  This case differs from the typical case, however, because EPCH, although a

party to the Agreement, did not apparently broker the
Transaction.

Apothecare terminated the Agreement and discharged EPCH
long before Apothecare began negotiating the Transaction with
Clearview and Starboard.  EPCH played no role in structuring,
financing or otherwise facilitating the Transaction.  EPCH
contends only that it identified and/or contacted Clearview and
Starboard regarding potential interest in a transaction in the
healthcare services industry.  Consequently, EPCH did not
"broker" a securities transaction in violation of the securities
laws.

The test for voidability in the absence of performance is
whether an agreement could have been performed without violating
the securities laws. See NTV Mgmt., Inc., 140 N.E.3d at 446
("The issue then becomes whether the contractual language
necessitates the conclusion that NTV was required to "effect" a
transaction in "securities."); see also Berckeley Inv. Grp. v.
Colkitt, 455 F.3d 195, 206 (3d Cir. 2006).  The Court must,
therefore, determine whether EPCH could have performed the
Agreement without affecting or inducing a transaction involving
securities.

The Sell-Side Agreement anticipates EPCH assisting
Apothecare "in the sale of all or part of [Apothecare] or its

assets . . . or assisting in the formation of a joint venture."
By its terms, the Agreement contemplates either a sale of
assets, which would not involve the purchase or sale of
securities, or an equity sale, which would. See NTV, 140 N.E.3d
at 446.  The Agreement also fails to specify what role a buyer
would have in Apothecare following the Transaction. See id.
Accordingly, had the Agreement not been terminated, EPCH could
have fulfilled its obligation without violating the securities
laws by facilitating an asset sale.  The Agreement is,
therefore, not void pursuant to 15 U.S.C. § 78cc(b) or Mass.
Gen. L. c. 110A, § 410(f) and there is no need to consider the
application of the MUSA safe harbor.

### 2. **Performance of the Agreement**

The Court now considers the substance of the Agreement and
whether Apothecare breached it by declining to pay EPCH a
Success Fee.  The Fee Tail Provision obligates Apothecare to pay
EPCH a Success Fee if, within 18 months of the date of the
Agreement's termination,

> any Transaction with a company or individual
> **identified or contacted** by [EPCH] during the term of
> this agreement (a "**Transactional Partner**")) is
> consummated . . . .

The parties' dispute focuses on the bolded language.  EPCH
submits that, prior to the termination of the Agreement, it

"identified" both Clearview and Starboard in its Potential Buyers List and "contacted" Clearview.  Apothecare responds that EPCH's Potential Buyers List did not "identify" companies as contemplated by the Fee Tail Provision and disputes whether EPCH ever contacted Clearview.

Contract terms must be construed initially in their "usual and ordinary sense." Gen. Convention of New Jerusalem in the USA, Inc. v. MacKenzie, 874 N.E.2d 1084, 1087 (Mass. 2007) (citing Ober v. Nat'l Cas. Co., 60 N.E.2d 90, 91 (Mass. 1945)). Individual terms must also be considered in the "context of the entire contract rather than in isolation." Id. (citing Starr v. Fordham, 648 N.E.2d 1261, 1269 (Mass. 1995)).

The Court begins with EPCH's claim that it identified Clearview and Starboard.  There are several dictionary definitions of "identify," some of which merely require establishing the identity of someone or something. Identify, Webster's New World College Dictionary (5th ed. 2014).  Reading the word in the context of the Agreement, however, the Court concludes that the parties did not intend for the Agreement to entitle EPCH to a Success Fee for identifying a company that might be somewhat interested in acquiring a healthcare services company.

The Court is persuaded that the meaning of "identify" as used in the Agreement is "to connect, associate, or involve closely." Id.  Applying that definition, EPCH is entitled to its Success Fee if it identified a company with some connection, association or close involvement with Apothecare.  The question then becomes: What level of connection, association or involvement is required?

EPCH contends that it needed only to identify a company or individual as a potential buyer.  Apothecare rejoins that the Agreement requires the identification of "Transactional Partner" which EPCH mistakenly conflates as synonymous with potential buyer.  This Court agrees with Apothecare.

The Agreement refers more than once to buyers or potential buyers as entities separate and distinct from a "Transactional Partners."  For example, the first paragraph of the Agreement states that Apothecare agrees to advise EPCH of "buyers, agents (i.e. Brokers, etc.), or other Transactional Partners that [Apothecare] wishes to consider."  That provision compels the conclusion that "Transactional Partner" is not synonymous with "potential buyer."  To conclude otherwise would render the term surplusage in contravention of standard rules of contact interpretation. See FIDC v. Singh, 977 F.2d 18, 22 (1st Cir. 1992) ("[E]very word . . . of an instrument is if possible to be

given meaning, and none is to be rejected as surplusage if any other course is rationally possible.").

In the context of the Agreement, the Court concludes that Transactional Partner refers to a company with a closer association to Apothecare than a potential buyer.  The parties refer only to a "Transactional Partner" and not to potential buyers in the Fee Tail Provision which presumes some level of direct interest in Apothecare resulting in the consummation of a transaction.  Indeed, the juxtaposition of the words "transactional" and "partner" implies an entity that seeks to engage in or conduct business with another entity. See *Transactional*, Webster's New World College Dictionary (5th ed. 2014); *Partner*, Webster's New World College Dictionary (5th ed. 2014).  In this case, that invokes a closer connection than one of the hundreds of companies on the Potential Buyers List. EPCH's listing of Clearview and Starboard on the Potential Buyers List is, therefore, insufficient to warrant a Success Fee.

With respect to EPCH's claim that it contacted Clearview, the parties dispute the facts.  EPCH submits that Lazowski, an EdgePoint employee, spoke with Blevins, a friend associated with Clearview, before EPCH submitted the Potential Buyers List to

Apothecare.  According to Lazowski's sworn testimony, he asked
Blevins whether Clearview would be interested in a

> roughly 6-million-dollar EBITDA pharmacy/drug
> distribution business located east of the Mississippi.

Apothecare doubts the veracity of Lazowski's testimony and
submits competing testimony of Clearview employee, William Case,
who was introduced to Apothecare by Starboard and maintains that
he is unaware of anyone at EdgePoint ever contacting Clearview
regarding Apothecare.

The Court need not resolve that factual dispute, however,
because even if accepts Lazowski's statement as true, EPCH is
not entitled to a Success Fee.  As with the identification
reference in the Fee Tail Provision, the contact reference
requires a Transactional Partner.  Consequently, EPCH is
entitled to a Success Fee only if it contacted Clearview with
respect to the engagement or conduct of a business venture with
Apothecare.  Viewing the record in a light most favorable to
EPCH, Lazowski did not mention Apothecare by name and provided
only a vague industry description, approximate EBITDA and
ambiguous location encompassing one half of the country.  Such a
nebulous description is insufficient to satisfy the contractual
requirement of finding a Transactional Partner.

The mediocre draftsmanship and circularity of the Fee Tail Provision is not lost on the Court.  Nevertheless, Apothecare's interpretation best approximates the plain meaning of the terms read in the context of the Agreement and the overall objectives of the parties.  Indeed, the purpose of the Fee Tail Provision was to compensate EPCH in the event Apothecare terminated the Agreement and subsequently contracted with a company that EPCH introduced.  Here, that did not happen.  The act of listing Clearview and Starboard among 300 entities or vaguely describing a look-alike to an associate in passing does not satisfy the Fee Tail Provision or entitle EPCH to compensation.

Accordingly, EPCH is not entitled to the Success Fee and Apothecare is entitled to summary judgment on EPCH's breach of contract claim.

### 3. The Indemnification Provision

EPCH seeks to recover attorneys' fees it has incurred in this lawsuit pursuant to the Indemnification Provision which requires Apothecare to indemnify EPCH against

> all claims, losses, damages, liabilities, judgments, costs and expenses (including attorneys fees) arising out of or related to EdgePoint's engagement . . . .

Under Massachusetts law, indemnification claims are not strictly limited to third party suits and may, in certain circumstances, encompass suits between the

indemnitor and indemnitee. <u>Caldwell Tanks, Inc.</u> v. <u>Haley & Ward, Inc.</u>, 471 F.3d 210, 216-17 (1st Cir. 2006). When an indemnitee seeks to recover "self-inflicted costs incurred in prosecuting affirmative claims against an indemnitor," however, there is a "strong argument that [the indemnitor] should not be required to reimburse attorney's fees." <u>Id.</u> at 217.  This Court concurs.  Apothecare will not be required to reimburse fees incurred by the unsuccessful plaintiff in this lawsuit and is, therefore, entitled to summary judgment on EPCH's indemnification claim.

### 4. Apothecare's Fraudulent Inducement Defense

In defense of plaintiff's breach of contract claim, Apothecare contends that it was fraudulently induced into signing the Sell-Side Agreement.  Specifically, Apothecare claims that the email signatures of EPCH employees referred to "EdgePoint" as a member of the Financial Industry Regulatory Authority ("FINRA") even though EPCH is not a FINRA member.  EPCH contends that it is entitled to summary judgment because EdgePoint Advisors is a FINRA member and the email signatures of EPCH employees were not material to Apothecare's decision to enter into the Agreement.

Having concluded that Apothecare is entitled to summary judgment on the merits, the Court need not

determine whether it was fraudulently induced into signing the Agreement.  Apothecare's motion for summary judgment will, therefore, be denied.

**ORDER**

For the foregoing reasons,

(a)   the motion of plaintiff EdgePoint Capital Holdings, LLC ("EPCH") for summary judgment (Docket No. 48) is **DENIED;**

(b)   the cross motion of defendant Apothecare Pharmacy, LLC, ("Apothecare") (Docket No. 65) is **ALLOWED;** and

(c)   the motion of plaintiff EPCH for summary judgment as to Apothecare's defense of fraudulent inducement (Docket No. 75) is **DENIED.**


**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge


Dated August 7, 2020